JUSTICE BARZ
delivered the Opinion of the Court.
The District Court of the Eighth Judicial District, Cascade County, Judge Joel G. Roth presiding without a jury, concluded that Daniels, a minority shareholder in T & D Properties, was entitled to $53,128 for his shares in T & D Properties. The District Court based this conclusion on breach of fiduciary duty, oppressive negotiation tactics, constructive fraud, and the presence of a contract between Daniels and Thomas in which Thomas allegedly promised to pay Daniels fair market value for his shares in T & D Properties. The court then granted Daniels his costs in this matter, which included his costs of hiring an appraiser. The court, however, did not find a contractual or statutory right which would allow Daniels to recover his attorney’s fees. Defendants appeal. We reverse.
The following issues are raised on appeal:
1. Whether the filing of Daniels’ motion for substitution of judge divested Judge Roth of the power to render a judgment on this matter.
2. Whether the District Court erred in ruling that a contract existed which required T & D Properties to purchase Daniels’ shares in T & D Properties.
3. Whether the District Court erred in ruling that Daniels was entitled under Montana law to have his shares in T & D Properties appraised and purchased.
4. Whether the pleadings fairly apprised the defendants of the nature of the claims against them.
5. Whether the judgment rendered by the District Court properly lies against all three defendants, T D & H, a corporation, T. H. Thomas, an individual, and T & D Properties, a corporation.
*129 6. Whether the District Court erred in awarding Daniels his appraisal fees.
7. Whether the restrictive covenant in the TD&H buy-sell agreement is void under § 28-2-703, MCA.
On cross-appeal, Daniels raises the following issue:
Whether the District Court erred by not awarding Daniels his attorney’s fees.
Thomas, Dean & Hoskins, Inc. (T D & H), a defendant, is an engineering firm founded in 1965. T D & H’s principal place of business is in Great Falls with branch offices in Kalispell and Bozeman. Thomas & Dean Properties, Inc. (T & D Properties), also a defendant in this lawsuit, is a separate corporation from T D & H. T & D Properties was formed in 1970 for the purpose of developing real estate and for the purpose of holding real and personal property. This property is then leased to T D & H. T & D Properties has never paid dividends, but instead pays “management fees” to T D & H. These fees are then generally distributed as bonuses to T D & H’s employees and shareholders. T. H. Thomas, another defendant, is the president and a director of both TD&H and T & D Properties and also a major shareholder in both of these corporations.
Douglas E. Daniels, the plaintiff, is a civil engineer who began working for T D & H in 1969. In 1976, Daniel’s began purchasing stock inTD&H. TD&H employees who purchased stock in T D & H were also initially expected to purchase an identical proportion of stocks in T & D Properties, however, the TD&H shareholder agreement that was signed in 1979 abolished this requirement. The shareholder agreement also contained a buy-sell agreement for T D & H stock upon the voluntary or involuntary termination from T D & H. The agreement established a formula price for the purchase of the TD&H stocks, a time period in which they will be paid, and a restrictive covenant. No buy-sell agreement was established for the T & D Properties stock.
In 1985, Daniels was living in Bozeman and managing T D & H’s branch office in Bozeman. Upon Dean’s retirement from T D & H in 1986, Thomas requested that Daniels move to Great Falls to manage the Great Falls office. Daniels had just built a home in Bozeman and therefore requested that alternatives to his moving to Great Falls be considered. In mid-February 1986, Thomas and Daniels met to *130 discuss possible alternatives. The parties agreed to a three-month trial period beginning February 18, 1986, whereby Daniels lived in Bozeman and commuted to Great Falls.
On April 16, 1986, two months after the three-month trial period began, Thomas and Daniels met again at Thomas’ request to review the situation. The meeting did not go well. Daniels then suggested that they discuss a termination agreement and Thomas agreed to prepare a proposed termination agreement.
The termination agreement was drafted by an attorney for T D & H and mailed to Daniels on April 18, 1986. Besides providing for the termination of Daniels’ employment with T D & H, the termination agreement also provided for the purchase of Daniels’ T & D Properties stock. A disagreement arose over the valuation of Daniels’T & D Properties stock. Daniels therefore did not sign the agreement. On May 13, 1986, Daniels and Thomas met and attempted to negotiate the value of the T & D Properties stock, but without success.
On September 17,1986, in response to a letter written by Daniels, Thomas offered to settle the dispute through negotiations with Jack Holland, an employee of T D & H. On September 24, 1986, Daniels was advised that Jack Holland had been authorized by each corporation to settle Daniels’ claims against the corporations with Daniels separately. Holland met with Daniels for two days in September but the negotiations were unsuccessful.
The relationship between Daniels and Thomas continued to deteriorate and on March 27, 1987, Daniels filed a complaint in the District Court of the Eighth Judicial District, Cascade County, alleging bad faith and wrongful termination against T D & H and fraud, breach of fiduciary duty, undue influence, and negligent misrepresentation against Thomas and both corporations. Along with the complaint, Daniels filed a motion for substitution of judge. The case was never transferred to another judge. Just prior to the trial, on June 10,1988, Judge Roth brought the parties’ attention to the motion. At that time, the parties’ attorneys stipulated that Judge Roth may sit as trial judge in the case.
This case was bifurcated into two separate actions over vigorous objection by defendants. The action involving legal claims of wrongful termination and breach of good faith and fair dealing in an employment situation was postponed until a later date for a jury. The action in equity involving whether Daniels was entitled to an appraisal remedy in regard to his T & D Properties stock was then tried without a jury on July 6, 7 and 8,1988. The trial was recessed *131 until August 15, 1988 when testimony was completed. Earlier, on July 5, 1988, the District Court had granted Daniels’ motion for partial summary judgment, ordering that the restrictive covenant found in the 1979 shareholder agreement was an unreasonable burden on the employee and ordered the provision void under § 28-2 703, MCA.
The District Court rendered its judgment on September 14, 1988, concluding that T & D Properties entered into an enforceable contract to pay Daniels, a minority shareholder, for his T & D Properties stock; that Thomas, as president of both T D & H and T & D Properties violated his fiduciary duty by inducing Daniels to leave his employment and by his adversarial negotiation stance; that Daniels, as a minority shareholder, demonstrated an equitable right to have his stocks in T & D Properties appraised and purchased by T & D Properties because of Thomas’ oppressive negotiation tactics; and that Thomas’ attempts to gain an unfair advantage over Daniels amounted to constructive fraud under Montana law. The court then concluded that the valuation method used by T & D Properties was unfair and therefore adopted the net asset approach as a reasonable method for determining the value of the corporate stock owned by a minority shareholder. The court ordered that under this method Daniels’ T & D Properties stocks were worth $53,128. The court also concluded that Daniels was entitled to his costs in this matter, which included his cost of hiring an appraiser. The court, however, also concluded that no contractual or statutory right existed for Daniels to recover his attorney’s fees from the defendants. Defendants appeal, and plaintiff cross-appeals, raising the following issues.
The first issue this Court will address on appeal is whether the filing of Daniels’ motion for substitution of judge divested Judge Roth of the power to render a judgment on this matter.
Defendants cite § 3-1-804, MCA (1987), to argue that Daniels’ filing of the motion for substitution of judge divested Judge Roth of the power to decide the case. This statute states in pertinent part that:
“After a timely motion has been filed, the substituted judge shall have no power to act on the merits of the cause and shall call in another judge.”
Section 3-1-804(1) (a), MCA (1987). However, Daniels’ motion for substitution of judge was filed on March 27, 1987. The law in effect on that date provided in pertinent part that:
*132 “A motion for substitution of a judge shall be made by filing a written motion for substitution reading as follows:
“ ’The undersigned hereby moves for substitution of another judge for Judge_in this cause.’ The clerk of court shall immediately give notice thereof to all parties and to the judge named in the motion. Upon filing this notice, the judge named in the motion shall have no further power to act in the cause other than to call in another judge, which he shall do forthwith, and to set the calendar.”
Section 3-1-802, MCA (1985). The record indicates that the clerk of court did not give notice to either the judge or the opposing parties nor was a notice of this substitution filed as required by § 3-1-802, MCA (1985). Because the requirements of the 1985 statute were not followed, Judge Roth retained jurisdiction of the case.
We also note, however, that contrary to what Daniels attempts to assert, a judge could not obtain jurisdiction through the consent of the parties in this case. See, e.g., Corban v. Corban (1972), 161 Mont. 93, 96, 504 P.2d 985, 987; In re Woodside-Florence Irrigation Dist. (1948), 121 Mont. 346, 352, 194 P.2d 241, 244. The parties’ stipulation was therefore not effective in allowing Judge Roth to retain jurisdiction of the case. If the motion was filed only three months later, the pertinent law in effect would have been the 1987 statute, and Judge Roth would not have retained jurisdiction of the case. However, in light of the unique set of facts in this case Judge Roth did retain jurisdiction.
The second issue raised on appeal is whether the District Court erred in ruling that a contract existed which required T & D Properties to purchase Daniels’ shares in T & D Properties.
In spite of the absence of a written agreement, the District Court concluded that T & D Properties entered into an enforceable contract to pay Daniels for his stock in T & D Properties. The court stated that Thomas’ testimony at trial indicated that he promised to pay fair market value for Daniels’ stock. The testimony the District Court apparently relied upon to find a contract between Daniels and Thomas stated that:
“Q: (By Mr. Lynch) What promise was made to him about purchasing the stock at the fair market value?
“A: We said that we would be willing to negotiate that separate from T, D & H to negotiate a reasonable settlement and that we would be willing to prepare — pay fair market value, and with that the way it had to be an agreement that was made that he was willing to take it, and we made no guarantee we would reach an agreement with him *133 or pay him whatever (he) wanted.” (Emphasis added.)
The District Court also justified its position by stating that this Court indicated that the district courts are to look beyond the statutory criteria and “into the equities of the situation” (citing Maddox v. Norman (1983), 206 Mont. 1, 11, 669 P.2d 230, 235).
All contracts must contain four essential elements. These elements are: (1) identifiable parties capable of contracting, (2) the parties’ consent, (3) a lawful object, and (4) consideration. Section 28-2-102, MCA; Modern Machinery v. Flathead County (1982), 202 Mont. 140, 144, 656 P.2d 206, 209. In the present case, the purported contract fails for a lack of consent. To have consent, there must be both an offer and an acceptance of that offer. Modern Machinery, 202 Mont, at 144, 656 P.2d at 209. Thomas’ testimony that the District Court apparently relied upon to conclude that an agreement existed between Daniels and Thomas for the purchase of Daniels’ stock in T & D Properties was not sufficient to establish that Thomas made an offer to Daniels for the stock. In addition, no evidence exists that Daniels ever accepted any offer that was purportedly made by Thomas.
The Restatement (Second) of Contracts, § 24 defines an offer as:
“[t]he manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.”
In the present case, Thomas’ testimony does not rise to the level of an offer. Although Thomas did testify that he would be willing to pay fair market value for Daniels’ stock in T & D Properties, Thomas also clearly stated that “we would be willing to negotiate a reasonable settlement” and that “we made no guarantee we would reach an agreement with him or pay him whatever [he] wanted.”
Thomas’ testimony on which the District Court relied upon is merely evidence of the negotiations that occurred between Thomas and Daniels and not an offer made by Thomas. The District Court had previously recognized that no agreement existed when it denied defendants’ motion for directed verdict, stating that “[t]here was a promise made to pay fair market value of the T & D [Properties] stock and the parties have been negotiating but have never reached an agreement and they are at a definite impasse.” In addition, the District Court’s reliance upon Maddox to justify ignoring the statutory criteria and to look into the equities of the situation is not appropriate under these set of facts. As this Court has previously stated “[e]quity can enforce provisions of contracts but it cannot *134 supply them.” Myhre v. Myhre (1976), 170 Mont. 410, 424, 554 P.2d 276, 283. Thomas’ testimony does not contain language that rises to an offer and therefore equity cannot be relied upon to create an offer.
The third issue that will be addressed on appeal is whether the District Court erred in ruling that Daniels was entitled under Montana law to have his stock in T & D Properties appraised and purchased.
T & D Properties is a closely held corporation but has not elected to become a statutory close corporation under the Montana Close Corporation Act, § 35-9-101 et seq., MCA. Therefore, Daniels’ claims are governed by the provisions of the Montana Business Corporation Act, § 35-1-101 et seq., MCA. The District Court concluded that Daniels was entitled to $53,128 for his three and one-half shares of T & D Properties. The court based its conclusion on findings of a breach of a fiduciary duty, oppression of a minority shareholder and constructive fraud. In light of these findings, the District Court apparently concluded that under §§ 35-1-810, 35-1-921, MCA, and case law that it was empowered to appraise the stock of a minority shareholder and order T & D Properties to purchase Daniels’ stock in T & D Properties for the sum of $53,128.
The proceedings in the District Court were of a broad equitable nature. Furthermore, many issues raised on appeal are mixed questions of law and fact. This Court’s duty upon review of equity cases and proceedings of an equitable nature is to review all questions of fact arising upon the evidence presented in the record, whether the evidence is alleged to be insufficient or not, and to determine the same, as well as questions of law. Section 3-2-204(5), MCA. “There is in that statutory requirement for our appellate review a measure of protection for the losing party coming to us on appeal, at least in equity cases such as this. Sawyer-Adecor Int’l, Inc. v. Anglin (1982), 198 Mont. 440, 447, 646 P.2d 1194, 1198. We recognize that Rule 52(a), M.R.Civ.P. requires findings of fact made by the district court to be upheld unless they are clearly erroneous and that Rule 52(a) does not make any distinction between cases of an equitable nature and cases at law. However, this Court has stated that we will review both questions of law and questions of fact but will not reverse the trial court in an equity case on questions of fact unless there is a decided preponderance of the evidence against those findings. Sawyer-Adecor, 646 P.2d at 1199; Boz-Lew Builders v. Smith *135 (1977), 174 Mont. 448, 452, 571 P.2d 389, 391. Afterreviewingthe recordweholdthereisapreponderanceoftheevidenceintherecord againstthefindingsoftheDistrictCourt.

A. Dissenter’s Rights

The District Court found that one of the bases of Daniels’ right to an appraisal was a corporate resolution to pay Daniels for his shares, thus, triggering the following provision:
“Any shareholder of a corporation shall have the right to dissent from and to obtain payment for his shares in the event of any of the following corporate actions:
“(e) any other corporate action taken pursuant to a shareholder vote with respect to which the ... resolution of the board of directors directs that dissenting shareholders have a right to obtain payment of their shares.”
Section 35-1-810(1) (e), MCA.
The District Court’s ruling is unsupported by the evidence presented. No such corporate resolution was entered into the record. Thomas testified that he was authorized to offer up to $35,000 for Daniels’ stock, but there was no testimony that Thomas was directed to purchase the stock. Exhibit 19c is a stockholder letter dated September 24, 1986, authorizing Jack Holland, an employee of T D & H, to settle any and all claims against T & D Properties. It is not a board resolution directing purchase of Daniels’ stock. Moreover, the requirements of § 35-l-810(e), MCA, were not satisfied. This section clearly contemplates corporate action pursuant to a shareholder vote from which a shareholder dissents, followed by a resolution of the board of directors directing that such dissenter has a right to withdraw his investment and obtain payment for his shares. That is not what occurred in this case.

B. Fiduciary Duty

In the present case, Thomas’ actions do not rise — either statutorily or in equity — to the level in which a court should interfere with a close corporation’s business affairs. In its conclusions of law, the District Court first found that Thomas had breached his fiduciary duty to Daniels. In particular, the court found that Thomas: (1) induced Daniels to leave his employment; (2) represented that Daniels would receive 100% of his T D & H stock and “fair value” for his T & D Properties stock; (3) failed to disclose material facts relating to his interpretation of the fair market value of the T & D Properties *136 stock; (4) attempted “to force” Daniels to accept an unfair price for the T & D Properties stock in order for Daniels to receive full value for the T D & H stock; (5) took an adversarial negotiation stance; (6) did not fully disclose the value of the stock when considering his highest offer of $25,000 and the court’s subsequent valuation of the stock at $53,128; (7) refused to share the cost of an independent appraiser; (8) refused to take the suggestions by Daniels for a resolution for the dispute; and (9) attempted to use his accountant’s analysis of some property in an unfair manner.
In finding that Thomas breached his fiduciary duty to Daniels, a minority shareholder, the District Court primarily relied upon this Court’s decisions in Skierka v. Skierka Bros., Inc. (1981), 192 Mont. 505, 629 P.2d 214; Deist v. Wachholz (1984), 208 Mont. 207, 678 P.2d 188; and Dunfee v. Baskin-Robbins (1986), 221 Mont. 447, 720 P.2d 1148. In each of these three cases, fiduciary duties were addressed. However, the relationship between the parties in those cases are substantially different from the present case, and therefore the court’s reliance on them for defining Thomas’ fiduciary duty was not appropriate.
In Deist, this Court determined that the unique relationship between a bank’s agent and a customer created a fiduciary duty running from the agent to the customer. Deist, 208 Mont. at 219-20, 678 P.2d at 194-95. This Court in Dunfee determined that it did not have to decide whether the special facts and circumstances of that case gave rise to a fiduciary duty. Dunfee, 221 Mont. at 452, 720 P.2d at 1151. Neither of these two cases addressed the unique relationship between shareholders of a close corporation. While the facts of Skierka involved shareholders of a close corporation, the relationship between the shareholders in Skierka consisted of special circumstances that are not necessarily found between all shareholders of a close corporation. The trust relationship between the shareholders that this Court focused on in Skierka was that of an executor’s trusteeship over the assets of the decedent’s estate for the benefit of the devisees. Skierka, 192 Mont. at 513, 629 P.2d at 218. This Court therefore relied completely on the trustee’s statutes — §§ 72-20-201 through -211, MCA (1979). These statutes are not applicable when the relationship between the two close corporation’s shareholders does not involve an executor of an estate and the beneficiaries.
This Court has previously noted that the relationship between close corporations closely approximates the relationship between partners. Fox v. 7L Bar Ranch (1982), 198 Mont. 201, 212-13, *137 645 P.2d 929, 935. This Court, however, has never elaborated on the fiduciary duty between shareholders in a close corporation when no other type of relationship between the shareholders existed. The Supreme Judicial Court of Massachusetts in Donahue v. Rodd Electrotype Co. of New England, Inc. (1975), 367 Mass. 578, 328 N.E.2d 505, has addressed the fiduciary duty in such a relationship. In Donahue, the Massachusetts court held that shareholders in a close corporation have a duty to act in the “utmost good faith and loyalty’ to one another. Donahue, 328 N.E. 2d at 515-17. The Massachusetts court further stated that “[t]hey may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.” (Emphasis added.) Donahue, 328 N.E.2d at 515. See also, Solomon v. Atlantis Development, Inc. (1986), 146 Vt. 349, 516 A.2d 132; Jones v. H.F. Ahmanson & Co. (1969), 1 Cal.3d 93, 81 Cal. Rptr. 592, 460 P.2d 464; Fix v. Fix Material Co., Inc. (Mo.Ct.App. 1976), 538 S.W.2d 351; Baker v. Commercial Body Builders, Inc. (1973), 264 Or. 614, 507 P.2d 387.
The Massachusetts court subsequently refined this duty in Wilkes v. Springside Nursing Home, Inc. (1976), 370 Mass 842, 353 N.E.2d 657. In Wilkes, the court acknowledged that the controlling group in a close corporation have certain rights to what has been termed “selfish ownership” in the corporation which need to be balanced against their fiduciary obligation to minority stockholders and stated:
“Therefore, when minority stockholders in a close corporation bring suit against the majority alleging a breach of the strict good faith duty owed to them by the majority, we must carefully analyze the action taken by the controlling stockholders in the individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action .... In asking this question, we acknowledge the fact that the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation .... If called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative.” (Citations omitted.) Wilkes, 353 N.E. 2d at 663.
We determine that the reasoning of the Massachusetts comb is persuasive and also hold that the fiduciary duty between stockholders of a close corporation is one of the “utmost good faith and loyalty.” However, the controlling group should not be stymied by a minority *138 stockholder’s grievances if the controlling group can demonstrate a legitimate business purpose and the minority stockholder cannot demonstrate a less harmful alternative.
The facts of the present case, as set forth above in the District Court’s findings, do not exhibit a breach of the fiduciary duty by Thomas to the shareholders of T & D Properties. The evidence demonstrates that there were five shareholders in T & D Properties. Besides Daniels, who had three and one-half shares, the other shareholders are listed as Duanne C. Dean, with eighteen and one-half shares, Marilyn P. Thomas with eighteen and one-half shares, Sandra K. Cummings, with three and one-half shares, and Dorothy E. Lorang, who held three shares. Duanne Dean, Marilyn Thomas and Sandra Cummings received their shares from their husbands, Wayne Dean, T. H. Thomas and James Cummings, respectively. Dorothy Lorang, the T D & H office manager, held her T & D Properties stock in her own name. Daniels initially had his three and one-half shares in his wife’s name, but received it back in a dissolution settlement in 1980. Although Thomas’ wife held his eighteen and one-half shares of T & D Properties, neither party disputes Thomas’ real interest in T & D Properties. Rather, Thomas testified that he controlled the eighteen and one-half shares of the forty-seven shares of T & D Properties, or approximately thirty-nine percent. We therefore determine that Thomas was a majority shareholder in T & D Properties for the purpose of this appeal. To hold otherwise would ignore the realities of the situation in this close corporation and rely merely upon technicalities.
When negotiating for the purchase of Daniels’ shares of T & D Properties, Thomas’ fiduciary duty of the “utmost good faith and loyalty” was to all of the shareholders of T & D Properties, not just to Daniels. And as the evidence demonstrates, Daniels was not the only minority shareholder, Lorang and Cummings were also minority shareholders. When applying the balancing test, we hold that Thomas successfully demonstrated that his duty to these other shareholders was not to pay Daniels a price for Daniels’ three and one-half shares that the corporation could not afford so as not to harm the other shareholders or the corporation. Daniels, however, failed to demonstrate the practicability of a less harmful alternative, he merely insisted that the corporation buy his shares at the price he named. This Court is not in a position to make a corporation’s business decision when the controlling group can demonstrate a legitimate business purpose for its decision and the minority *139 shareholder cannot demonstrate the practicability of a less harmful alternative. Additionally, the evidence demonstrates that Thomas offered to step aside and let Jack Holland handle the negotiations with Daniels, thereby eliminating any potential conflict of interest or undue influence.
Thomas was also a director of T & D Properties, therefore Thomas’ actions must also be measured by the “business judgment rule.” In Ski Roundtop, Inc. v. Hall (1983), 202 Mont. 260, 658 P.2d 1071, this Court adopted the business judgment rule. This Court recognized that when a reasonable basis exists to indicate that the directors of a corporation acted in good faith, the directors are immunized from liability for honest errors. Ski Roundtop, Inc., 202 Mont, at 273, 658 P.2d at 1078. Daniels failed to offer proof that Thomas’ actions were unreasonable in that they would not have been taken by “ ‘an ordinarily prudent man ... in the management of his own affairs of like magnitude and importance.’ ’’Alaska Plastics, Inc. v. Coppock (Alaska 1980), 621 P.2d 270, 278 (quoting Nanfito v. Tekseed Hybrid Co. (D. Neb. 1972), 341 F.Supp. 240, 244). Judges are not business experts and therefore should not substitute their judgment for the judgment of the directors. Alaska Plastics, Inc., 621 P.2d at 278. We hold that Thomas acted prudently and in accordance with the business judgment rule.
C. Oppression
The District Court also found that it had the power in equity to liquidate the corporation’s assets or require the purchase of a minority shareholder’s shares for fair market value whenever the acts of those that control the corporation’s actions are illegal, oppressive or fraudulent (citing § 35-1-921, MCA; Maddox, 206 Mont. 1,669 P.2d 230; and Skierka, 192 Mont. 505, 629 P.2d 214). The District Court then found that Thomas’ negotiation tactics with Daniels were oppressive to Daniels. In particular, the District Court found that Thomas’ actions were oppressive when he (1) attempted to force Daniels to accept his valuation of stock in T & D Properties by tying Daniels’ acceptance of the T & D Properties stock to the T D & H shareholder agreement; (2) refused to waive the anti-competition clause unless Daniels would accept Thomas’ $20,458 offer for his T & D Properties stock; (3) used his position as president of T D & H to influence the negotiations with Daniels and T & D Properties; and (4) mentioned to Daniels in the May 13, 1986 meeting that if Daniels did not sell his stock in T & D Properties that T D & H could, in effect, *140 bleed the assets from T & D Properties. The court therefore determined that Thomas used unfair negotiation tactics and that he unfairly used his positions with T D & H and T & D Properties to influence the negotiations with Daniels. The court found these actions by Thomas were oppressive and rose to the level in which the court could require T & D Properties to purchase Daniels’ three and one-half shares.
This Court has held that oppression may be more easily found in a close corporation than a larger, public corporation because shares in a closely held corporation are not offered for public sale. Fox, 198 Mont. at 209, 645 P.2d at 933; Skierka, 192 Mont. at 519, 619 P.2d at 221. We have also held that when addressing these type of cases, we will proceed on a case-by-case basis. Fox, 198 Mont. at 210, 645 P.2d at 933; Skierka, 192 Mont. at 519, 629 P.2d at 221. While the District Court correctly cited § 35-1-921, MCA, as the statute that allows a court to dissolve a corporation upon a showing of oppression, we hold, as discussed below, that Thomas’ actions did not rise to the level that would allow a court to take the drastic remedy of dissolution or to require a close corporation to purchase a minority shareholder’s stock.
A review of the other Montana decisions addressing closely held corporations and oppressive behavior by the controlling shareholders is helpful. In Skierka, the finding of oppression was based on the exclusion of the minority shareholder from participation in the operation of the corporation. Skierka, 192 Mont. at 518, 629 P.2d at 221. In Fox, we upheld the district court which found that the controlling shareholders’ conduct revealed a calculated and oppressive plan designed to deprive the minority shareholder of his rightful portion of the corporate holdings and profits by making sure he did not have access to them. Fox, 198 Mont. at 210, 645 P.2d at 933. The district court in Fox further found that the minority shareholder had been effectively deprived of any voice in management. Fox, 198 Mont. at 210, 645 P.2d at 934. This Court then held that these actions by the controlling shareholders violated the minority shareholder’s reasonable expectations of realizing monetary remuneration and of having a voice in management. Fox, 198 Mont, at 210, 645 P.2d at 934. On the other hand, the district court in Maddox found that although the controlling shareholders’ conduct “was not per forma as to corporate law or the corporation’s by-laws, ‘its informality was not oppressive toward the plaintiff, nor *141 was she defrauded.’ ” Maddox, 206 Mont. at 9, 669 P.2d at 234. This Court therefore affirmed the district court’s conclusion in Maddox of denying liquidation. Maddox, 206 Mont. at 13, 669 P.2d at 236.
In the present case, Thomas’ actions were more consistent with negotiation tactics than oppressive actions. Merely because Thomas attached conditions to his offer does not necessarily mean that his actions were oppressive. Additionally, the District Court’s finding that Thomas attempted to force Daniels to accept a settlement by tying in the T D & H shareholder agreement completely ignores the evidence that Thomas stepped aside in the negotiations and Jack Holland took over and attempted to settle the claims against the corporations separately. The court’s finding that Thomas made a statement in which he threatened to bleed the assets from T & D Properties also does not rise to the level of oppressive conduct that would warrant the ordering of T & D Properties to buy Daniels’ shares. Possible future oppressive actions are not sufficient to invoke § 35-1-921, MCA. On the other hand, if Thomas were to carry through with his threats, Daniels may then have had a legitimate cause of action in which he could allege that Thomas was engaging in oppressive actions against him as a minority shareholder. However, the mere possibility of oppression is not sufficient to warrant the remedy the District Court ordered here.
In addition, Thomas offered Daniels up to $25,000 for his shares in T & D Properties. Although Thomas also seemingly attached other conditions to this offer, Daniels did not have to accept the offer. In fact, Daniels rejected all of Thomas’ offers. The Supreme Court of Alaska addressed a similar situation in Alaska Plastics, Inc. v. Coppock (Alaska 1980), 621 P.2d 270. Alaska Plastics. Inc. involved the rights of a minority shareholder in a close corporation. In particular, the minority shareholder, Muir, held one-sixth of the Alaska Plastics, Inc. shares. The controlling shareholders consistently failed to inform Muir of shareholder meetings or informed her only a few hours before the meetings. In 1971 and 1972, the controlling group also traveled to Seattle for a shareholder’s meeting and brought their spouses at the company’s expense even though there was no business purpose for doing so. The controlling shareholders also voted themselves each an annual $3,000 director fee, however they never paid dividends. Coincidentally, Muir was the only shareholder who was not a director. Muir never received any money from the corporation. In May, 1974, the controlling shareholders offered Muir $15,000 for her shares in Alaska Plastics, Inc. Muir rejected and subsequently *142 hired an accountant to investigate the company’s books. The accountant estimated the value of Muir’s stock between $23,000 and $40,000. In 1975, Muir offered her stock to the corporation for $40,000. The board subsequently offered her $20,000 which she again rejected. Muir then filed a complaint.
In its findings of fact and conclusions of law, the district court concluded that:
“[T]he continued retention by Plaintiff [Muir] of one-sixth of the shares in Alaska Plastics, Inc. ... was oppressive to Plaintiff and ... an appropriate remedy would be to direct the transfer of Plaintiff’s shares to Alaska Plastics, Inc. in exchange for a fair and equitable value ...”
Alaska Plastics. Inc., 621 P.2d at 273. The court then ordered the corporation to purchase Muir’s shares for $32,000. The Alaska Supreme Court rejected the lower court’s conclusion that once the corporation made an offer to Muir it was -under an obligation to purchase her stock at a “fair” price, regardless of the price the corporation had initially offered. Alaska Plastics, Inc., 621 P. 2d at 276.
Likewise, merely because T & D Properties had made an offer for Daniels’ stock and merely because Thomas testified that they were willing to pay fair market value if they could agree to the terms, does not obligate the corporation to purchase Daniels’ T & D Properties stock. The record also demonstrates that the minority shareholder, Lorang, had also wanted to sell her shares in T & D Properties to the corporation, but the corporation did not have the funds to purchase them. Daniels’ insistence that the corporation should nonetheless purchase his shares in T & D Properties merely because of possible future oppression by the controlling shareholders is not persuasive. Furthermore, we agree with the court in Alaska Plastics, Inc. in which it stated that:
“We are not aware of any authority which would allow a court to order specific performance on the basis of an unaccepted offer, particularly on terms totally different from those offered. Such a rule would place a court in the impossible position of making and enforcing contracts between -unwilling parties.”
Alaska Plastics, Inc., 621 P.2d at 276.
We hold that Thomas’ actions were not so oppressive as to warrant the appraisal remedy ordered by the District Court.

*143
D. Constructive Fraud

The District Court concluded Thomas’ attempts to gain an unfair advantage over Daniels constituted constructive fraud under § 28-2-406, MCA. Section 28-2-406, MCA, provides that:
“Constructive fraud consists in:
“(1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; ...”
As already determined above, Thomas did not breach his fiduciary duty to Daniels. In addition, Thomas did not mislead Daniels to his prejudice. Thomas’ actions were not misleading but merely negotiation tactics. Daniels rejected all of Thomas’ offers, and then failed to prove how he was thus prejudiced.
We hold that the District Court erred in granting Daniels an appraisal remedy under § 35-1-921, MCA.
In light of our above holdings in this case, this Court does not need to address the following three issues raised on appeal: (1) whether the pleadings fairly apprised the defendants of the nature of the claims against them; (2) whether the judgment rendered by the District Court lies against all three defendants (T D & H, T. H. Thomas and T & D Properties); and (3) whether the District Court erred in awarding Daniels’ appraisal fees.
The last issue raised on appeal is whether the restrictive covenant clause in the T D & H buy-sell agreement is void under § 28-2-703, MCA.
The District Court found that as a matter of law, the restrictive covenant found in the buy-sell agreement at paragraph seventeen was void pursuant to § 28-2-703, MCA. Paragraph seventeen of the Agreement states that:
“Inasmuch as a shareholder has access to confidential information concerning the corporate business, it is mutually agreed that the compensation for a terminated shareholder who obtains employment with a competitive firm or enters any form of business in competition with the corporation shall be paid for his stock at the rate of seventy-five percent (75%) of the fair value.”
We disagree with the District Court on this issue.
Section 28-2-703, MCA, states that “Contracts in restraint of trade [are] generally void. Any contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, *144 otherwise than is provided for by 28-2-704 or 28-2-705, is to that extent void.” (Emphasis added.) The two exceptions allow parties to agree that upon either the sale of goodwill of a business or the dissolution of a partnership, one or more of the parties will refrain from carrying on a similar business within a narrow designated area. Sections 28-2-704 and -705, MCA.
The contract in this case is a share purchase agreement. This Court has applied § 28-2-703, MCA, to both employment contracts and to a lease which prohibited a competing full service restaurant within the same building. See, State Medical Oxygen and Supply, Inc. v. American Medical Oxygen Co. (1989), 240 Mont. 70, 782 P.2d 1272; Dobbins, DeGuire & Tucker v. Rutherford, MacDonald & Olson (1985), 218 Mont. 392, 708 P.2d 577; O’Neill v. Ferraro (1979), 182 Mont. 214, 596 P.2d 197. Since § 28-2-703, MCA, applies to any contract, the statute would also apply to a share purchase agreement. However, under certain factual circumstances a covenant restraining a lawful profession, trade or business of any kind may be acceptable if it passes a three part test of reasonableness. Under this test, a covenant not to compete is reasonable if it is: (1) limited in operation either as to time or place; (2) based upon some good consideration; and (3) affords reasonable protection for and not impose an unreasonable burden upon the employer, the employee, or the public. State Medical Oxygen and Supply. Inc., 240 Mont. at 74, 782 P.2d at 1275; Dobbins, 218 Mont. at 396-97, 708 P.2d at 580.
Defendants in this case assert that the agreement does not violate § 28-2-703, MCA, and therefore they have the burden of showing that the agreement does not violate the statute. State Medical Oxygen and Supply. Inc., 240 Mont. at 74, 782 P.2d at 1275; First American Ins. Agency v. Gould (1983), 203 Mont. 217, 223, 661 P.2d 451, 454. Defendants did not assert nor prove that the sale of goodwill of a business or the dissolution of a partnership occurred. Therefore, neither of the statutory exceptions — §§ 28-2-704 or -705, MCA — apply.
This Court must next apply the three part test to determine whether the covenant is reasonable. The first essential criterion that the defendants must demonstrate is that the covenant is limited in operation either as to time or place. Defendants assert that paragraph sixteen of the T D & H share purchase agreement satisfies the time criterion. Paragraph sixteen states that:
“A shareholder who voluntarily or involuntarily terminates employment except for purposes of retirement, death, or disability, shall *145 be paid for his shares at the fair value at the time of termination on a pro rata basis between the audits prior to and after termination. Payment will be made one hundred twenty (120) days after the audit following date of termination, but in no case sooner than two hundred forty (240) days after the date of termination.”
While paragraph seventeen specifies how much a terminated shareholder will be paid under certain conditions, paragraph sixteen specifies when the payment will be made. The agreement must be read as a whole. Section 28-3-202, MCA; St. Paul Fire and Marine Ins. Co. v. Cumiskey (1983), 204 Mont. 350, 363, 665 P.2d 223, 229. Upon reading the agreement, the restrictive covenant is definitely limited as to time.
The second criterion that the defendants must demonstrate is that the restrictive covenant is based upon some good consideration. The consideration flowing to Daniels under this covenant was his access to confidential information concerning the corporate business. The corporation’s consideration under this covenant was requiring the corporation to pay only seventy-five percent (75%) of the fair market value of the shareholder’s stock. Defendants therefore demonstrated that the restrictive covenant was based upon some good consideration.
The third and last criterion that the defendants must demonstrate is that the covenant affords reasonable protection for and not impose an unreasonable burden upon the employer, the employee, or the public. The covenant affords the corporation reasonable protection by deterring, but not prohibiting, competition with them for a period not to exceed two hundred forty (240) days. Deterring competition for this amount of time or requiring the terminated shareholder to take only seventy-five percent (75%) of the stock’s fair market value does not impose an unreasonable burden on the corporation, the terminated shareholder, or the public.
On cross-appeal, Daniels raises the issue of whether the District Court erred by not awarding Daniels his attorney’s fees. However, in light of our holdings in this case, we do not need to address this issue.
Reversed and remanded for proceedings consistent with this opinion.
CHIEF JUSTICE TURNAGE and JUSTICES HARRISON, WEBER and McDONOUGH concur.